Good afternoon. May it please the court. My name is Timothy Alger. I represent Roommate.com, LLC. And first I'd like to take a moment to thank the court and council for accommodating me regarding scheduling this year. It's very appreciated. I think this presents a more straightforward case than last time we were here when we were dealing with the CDA. We're really dealing with now the Fair Housing Act and what it applies to. And it's clear that not all statements about housing are governed by the FHA. Congress made it clear in the act itself that a dwelling is a residence of one or more families. That's part of the definition, Section 3602B. And the act presupposes that multiple families might be in a dwelling. Then 3604 itself talks about the sale or rental of a dwelling. It does not speak in terms of sale or rental of a portion of a building, which is how the district court phrased it. The district court essentially took out a portion of 3602. So you don't think it applies to apartments? I don't believe it applies to the selection of someone to share an apartment, Your Honor. In other words, it's the composition of an apartment. I understand. I know that's what you mean, but what's the answer to my question? I believe it applies to apartments if they're vacant. Okay, so you agree that a house is a dwelling? Yes. And you also take the position that an apartment, which is a subdivision of a large house, an apartment building is a house, so something less than a full house is a dwelling. Or if you have a duplex, you know what a duplex is? Yes. They're back east kind of things. Where are you from? I grew up in New Jersey. You grew up – okay, so you actually – I've lived in a duplex. You must have lived in – or new people. So, you know, that's a – a duplex can be either two townhouses with a common wall, or sometimes you have an upstairs-downstairs duplex. So you agree that both of those are covered by the FHA? Yes, Your Honor. Well, I have a hard time understanding what it is about – but you say once you get inside of one of these units, it's not a dwelling. I think the totality of the unit is a dwelling, and it's defined that way in 3602, that there's a dwelling that could be designed to be a residence, intended to be a residence for more than one or more families, and that dwelling itself is governed by the Fair Housing Act. You know, when I lived in Baltimore many years ago, we lived in a duplex, and it had originally been a townhouse. And what they did is they subdivided the top level from the bottom level, and they rented out the bottom where my parents and I lived, and then the landlords lived on top. But it had originally been a single-family dwelling. How is that different? Well, you're living independently there, and in that situation the Fair Housing Act would apply because the dwellings are residences in which households are independent of each other. And that's why the Mrs. Murphy exception is important here. We're not claiming to be protected under the Mrs. Murphy exception. I think the Mrs. Murphy exception indicates that Congress never intended to extend the Fair Housing Act to a roommate situation because Congress – Congress wanted to protect what was the situation that was presented in the Fair Housing Act that had the most private features of owner-occupied housing with four or less independent living families. Can you help me understand where the independent concept comes from? I know the definition of family can include a single individual. Is that right? Right. And so since dwelling is defined to include a portion of a building or a structure for one or more families, including an individual, it doesn't on its face seem to exclude this sort of shared living arrangement. So help me understand where you find that. Well, it's hard to understand where Congress was coming from at that time. I know that the legislative history and the people that have spent time researching the origins of the Act, there was a compromise in Congress because the southern senators were concerned about the Mrs. Murphy-type situations, which were boarding houses. So Congress has adopted this rule that you – if they're independent – people living independently, even if they have a shared – kind of a shared – maybe the shared living room, maybe they eat together and so forth, if they're independent, they might fall within the Fair Housing Act. So the Mrs. Murphy exception was necessary to deal with that situation. So if a case doesn't fall within the express Mrs. Murphy exception, doesn't that imply that therefore it's covered by 3604? My point would be that the Mrs. Murphy exception makes no sense. It's not logical if the Fair Housing Act reaches roommates. Because why would Congress go out of its way to protect Mrs. Murphy, who has privacy and security interests that are far less than a roommate situation where people are sharing a kitchen, perhaps bathrooms, living situations. They're taking – most of the time they're entering into long-term relationships where they are living together, where they have a house – they have boyfriends, girlfriends coming into the house, where they're in situations of undress, where they're not necessarily locked doors on their bedrooms, which is – in a boarding house many times there's locked doors. Why should Congress protect Mrs. Murphy's interests but not protect the roommates? It makes the whole thing illogical. Well, the Mrs. Murphy exception has certain requirements, and you have problems with at least three of them. One of them is – or at least you might have problems. I want to ask you about three of them. One of them is Mrs. Murphy has to be living there. Is there a requirement on roommates.com that you actually be living in the place if you're looking for a roommate? The manner in which the questionnaire is set up, it asks about who do you want to share with. The questions are all calculated towards the sharing of a residence. So your answer to my question is no. There's no requirement. You can state your desires of the kind of person you want to occupy the available space, but there's no requirement that you actually be there. Okay? Okay. I'm asking. I can see that. We haven't contended with – It's not a court session. I just don't know. I haven't been on roommates.com, and I didn't see anything on the record. And there might be a little checkbox that says I certify that I actually live there that I'm not aware of, which is – You're not contending that this comes within the Mrs. Murphy exception. No, Your Honor. We have never contended with this. Because I understand your argument. If they gave Mrs. Murphy an exception, they certainly would have given a roommate. Yes, Your Honor. If the statute reached that point. I understand that. On the other hand, I think it's important to see how far you are from Mrs. Murphy, which is why I'm exploring the differences. So one difference seems to be that you have no requirement that the person involved actually live on the property. So it could well be people who are looking for borders for a house where they don't live. I think we may have a definitional problem. The people that were matching up, if they answer the questionnaire honestly, they will both be living in the unit together. Well, okay. First of all, so what if they don't answer the question honestly? On the Internet, no one knows you're a dog. Nobody knows who they're telling the truth, right? So you might kick them off if you find out. But the fact is they can't easily answer the question. And, of course, it depends a little bit on what you mean by share. But in any event, there's no requirement, you're telling me, right? Let me go on to the other two questions. Is there a limit of four? Is there any other requirement that there be no more than four? No limit. In fact, some college people have multiples in their house, six, seven more. Right. So that's different from Mrs. Murphy. And Mrs. Murphy also doesn't apply to advertising. And whatever roommates is, it clearly is advertising, right? So Mrs. Murphy doesn't apply. The Mrs. Murphy exception doesn't apply for that reason. So I'm not quite sure I understand your argument about Mrs. Murphy since in three key ways you or your, what do you call them, clients, patrons, members, I don't know what you call them, the people who use your service. Users. Users, that's a good term. Your users don't necessarily meet two and almost certainly don't meet the third requirement. How does Mrs. Murphy, why does Mrs. Murphy hurt you rather than help you? Mrs. Murphy definitely helps me because Mrs. Murphy talks, we're not claiming Mrs. Murphy. She tries to help everybody. Mrs. Murphy has to have independent living families. There has to be four or fewer families living independently in Mrs. Murphy. And our users are not living independently. We've always pointed out that this is for a shared household. They're not living independently. And the questionnaire and- I'm sorry, that's another difference? Yes, sir. So it's a matter of- I see. You think that's a difference that helps you. That's a difference that helps me because Congress carved out an exception for Mrs. Murphy that makes no sense if the act on its face- No, I've had roommates. I'm sorry. I've had roommates when I was in college. And I'm not exactly sure what you mean by living independently. Let me just tell you what my perception was. Sometimes we shared food, but I had roommates who were of different ethnic backgrounds. I had a Korean roommate. I had a Bengali roommate who had specialized cuisine. So I shared food with some of my roommates, not with others. I was in situations where I got together with friends and rented an apartment. But I also had situations where the apartment owner said, I've got two slots available. A friend and I were looking for places. So we got slotted in with two other roommates, neither of which knew each other ahead of time, neither of which knew us. So I'm just wondering, when you say independent as opposed to- what is it about the roommates' relationship that makes them any different from the Mrs. Murphy situation? Well, of course, independently is not defined in the statute. Something you rely on. You want to say this is something that helps you. I'm just trying to see how much it helps you. I think there is a way to look at this because we have these boarding house cases. We have these homeless shelter cases out there where people are clearly sharing common locations. In those situations, there's always someone that is the manager of the housing situation. They're either in a dorm situation. There's a dorm manager. They're in a shelter. There's a third party that is controlling the environment. Even in Mrs. Murphy, it's her place. She's renting the place. She will arbitrate disputes among these independent living individuals. In a true roommate situation, the successful roommate arrangement is collaboration. People have to work together. And if they don't, they're miserable. That's why these personal aspects that come up in roommate matching are so important. This would be the only situation where people are living together being miserable. It's called marriage. So let's assume that even if we thought, yes, probably Congress wasn't thinking about this shared living arrangement or they wouldn't have made the Mrs. Murphy exception, the plain language of 3604, I don't see anything that would exclude shared living arrangements from its reach. So if we said, no, the plain language, whatever Congress may have been thinking or not thinking, covers this situation, does that mean that you lose then? No, it doesn't because I think you could do a couple of things. One is you can determine that there's some sort of a BFOQ situation where, in certain circumstances, people can freely choose based on privacy or security concerns. So that's also not in the statute. That's something you – in reading your brief, I didn't see any legal basis for that. It's not in the statute. It's not required by the Constitution. So that's just – it seems like a good idea. Is that – Well, I think that the fact that Congress didn't put a BFOQ in when it did put the provision in the Civil Rights Act suggests that Congress wasn't thinking about roommates, right? Because the Congress would have, in 1968 certainly, Congress would have been cognizant of privacy interests for people of different backgrounds and different genders. And they didn't put a BFOQ, which they did in the Civil Rights Act, suggesting that Congress was not worried about roommates, that Congress never intended the reach of the statute to go to shared living circumstances. They protected Mrs. Murphy, which is the closest thing, but she has even less interest than roommates in privacy and in security and so forth. She has less important interest than a roommate situation. And Congress built a BFOQ into the Civil Rights Act, but it didn't build it into the Fair Housing Act, suggesting that Congress had no intention to reach roommates with the Fair Housing Act. So my point is, if the court feels that the statute must reach roommates, then the court should look to the BFOQ standards, and the courts in this court in the community house case indicated that there might be a reason to use BFOQ standards in a housing situation. But then I think the court has an obligation to read the statute in light of the First Amendment and read the statute in light of intimate association rights. And whether condemning prohibiting speech in this context is going to offend the First Amendment, particularly whether it be under central Hudson or the expressive speech cases. Are your drop-down, the roommates' drop-down menus and the responses to them, which I believe is all that we're looking at here is my understanding from the en banc opinion, do those merely propose a commercial transaction, or do they do something else? No, they don't. And what's being sued over here is not the commercial transaction portion. The fact that we ask people how much they're willing to pay to share a place is not being sued over. It's the things that are important to people for other reasons. It's the compatibility issues. A woman might be more concerned about living with a woman. She feels more comfortable living with a woman. The security, the privacy issues. These are things that are important to people, and that's expressive. That's not commercial. It's not we will sell you X for Y price. These are expressive things. We ask people about their household habits. We ask people in the drop-down menu about whether they have pets. We ask people about whether they smoke. These are all matters that are highly personal, and they're not commercial. So it seems to me that the commercial standards shouldn't apply, although I think we win under Central Hudson as well. I think Central Hudson, of course, was decided long after the Fair Housing Act was enacted, and I don't think Congress was considering the standards. We have to have a substantial government interest. And what's the substantial government interest here for regulating speech when people can freely choose in an unspoken way who they're going to live with? So how does the government have a substantial interest? All we have is the psychic harm argument, and the Supreme Court has repeatedly rejected psychic harm as a substantial or compelling government interest. So if under 3604 it is unlawful for an individual to discriminate in the selection of someone to share his or her apartment, then is the speech on roommates related to an unlawful activity? So it doesn't even fall under the First Amendment. Well, my view is it isn't an unlawful activity, and both the district court and the plaintiffs acknowledge that people can choose based on preferential reasons. So does your argument then turn on, the constitutional First Amendment argument, turn on whether 3604 applies to shared living arrangements? Yes. You have about a minute and a half left. Yes, I'd like to save it, Your Honor. Thank you. Okay. We'll hear from Fair Housing Council. Good afternoon, Your Honors. I'm Elizabeth Brancard, and I'm appearing on behalf of the Fair Housing Councils. I wanted to go and address some of the questions that you had asked Mr. Alger, and I have different answers for you. If you look at the plain language of 3602D, the dwelling is any portion of a structure occupied as a residence by one or more families, which are individuals. So I think on the plain language of 3602, a dwelling would encompass shared housing. So is it then your position that under the plain language of the statute, it would be unlawful for, like the letter, the 28J letter, for a Christian woman to say, I'm going to share my room or my apartment with another Christian woman, that that would be a violation of 3604? Under the way that 3604 is written, that would be a violation of 3604C. So that would be an unlawful activity that would violate the statute. That would be under, yes, that would be unlawful, but to make the statement, but if the person satisfied the Mrs. Murphy exception, it would not. Well, per hypothesis, it doesn't. I mean, it would be as legal as activity then. Yeah, I mean, it doesn't. So it's just one person who's renting an apartment from some other person, she's not the owner, who is looking for a roommate to share her two-bedroom apartment or whatever, and only wants to be there with another woman, doesn't want to rent to a man. That would be unlawful under 3604. It would be on the plain language. HUD does not enforce that. California. Well, you're talking about enforcement. I want to know whether that's an unlawful action as you read the statute. That would be under the plain language of the statute. You don't really think that Congress intended that, do you, to tell women that they must share their bedrooms or their rooms with men and that they can't restrict it to women? Probably not. I don't think that they intended that, but I do think that You may not remember 1964 because you were probably not born then. I was. I was born then. But those were very prudish times, and I can assure you that if Congress had thought about it, they would not have counted this idea of a single woman sharing This was 1968, so. Oh, well. 1968 was getting a little more. But in this case, we don't even What do you do when you know that that's not what Congress intended in the statute? Because that is not what the case is that we have here. What we have here is Well, some of them are, right? But that's not who we're trying to find liable here. Well, if in fact, let's say that a woman wanting to rent only to another woman is lawful, it's not unlawful, then the speech that roommates is publishing is not related to an unlawful activity, so it's unlike the Pittsburgh Press situation where it was against the law to employ on a discriminatory basis. So then we have to look at the First Amendment protections. And so that sort of drop-down menu falls within the First Amendment, and we have to look at the First Amendment protections. I don't think you do because in this case, the speech we're looking at is roommates' own speech. Well, right, I acknowledge that, but it's protected by the First Amendment, right, unless it's related to an unlawful act. Why would it not be? Because the first act that roommates violated, the Fair Housing Act and the California FEHA was, was compelling people to disclose their protected status. So there definitely are people advertising on roommates who don't satisfy the Mrs. Murphy exception and some that do. And to demand that people disclose their protected status as a requirement of using the website, that in itself is illegal. Well, that's not what 3604 says. It has to do with printing or publishing certain discriminatory statements, right? Yes, but it also is contemplated that asking people their protected status is also a violation. And that is from the Jancic case and the Sewells case. So you're saying that this isn't about any speech that roommate's doing. It's about the setup of their board so that it doesn't matter what they're publishing, we're not concerned about what they're publishing. It's only because there's a mandatory feature. Is that what you're saying? Because I know that's one of their arguments about the scope of the injunction is that it should only apply to mandatory requirements, and that seems to be what you're saying here. That aspect is the mandatory requirement that people disclose their protected status. And then there's the other aspect where the people that have housing are required to state a preference. Will you live with children, will you not live with children? So it's only the mandatory requirement that you're concerned about? It's not other publications on the website? No, yes. Then they, in turn, publish that profile. But the main thing we're concerned about is the fact that they use this information to create a database which then operates to sort and select and steer people. But that's not covered by 3604C. That's 3604A. Yes, and I thought we only had 3604C. We have steering claims as well that we prevailed on. And that was in your complaint? It was 3604A, and that's with the district court? Because I thought the district court relied on 3604C. No, also 3604A. And also government code. And 3604D as well? No, the court did not rely on D. But it all depends on the underlying conduct being unlawful. If it's okay under the housing law to pick a roommate based on sex or sexual orientation or children or the like, then the speech winds up being it's okay to sort, it's okay to ask questions. It all hinges on the ultimate question as to whether the underlying conduct is illegal, right? I don't think so. No, I think that the fact that they're steering people away from housing opportunities based on their protected status, without even knowing what those housing opportunities are, whether they are going to be legal or not, that itself is a violation. I don't understand that at all. If it's fine, if let's say we look at the statute and we discover that a little known provision that you haven't found, but Congress says when you're picking a roommate, it's fine to discriminate based on sex or sexual orientation. They just say that's how we find the statute. How could it possibly be wrong for them to ask the question, are you of that sex or sexual orientation, in order to let people make the decision as to exercise this choice allowable by the statute? Well, because that language or using that language violates 3604C. Let's assume it's illegal. Well, I've posited it doesn't. I've posited that our provision says there's an exception for roommates, and that says when picking a roommate, you can discriminate based on sexual orientation, let's say, or sex. So if there is no underlying violation, none of the speech arguments fall. They all ultimately hinge on the illegality of the conduct. Exactly. Otherwise, we wouldn't be here. We'd be knocked out under the CDA. I thought you said that if we knew that Congress didn't mean to say that a woman doesn't have to live with a man, and that's not what the statute intended, then I thought we would not interpret the statute as finding anything wrong with advertising that you're a woman, and that you only want to live with a woman. Under various state laws, they explicitly state that that does not violate the state fair housing laws, that advertising that you only want to live with a woman is not covered or considered a discriminatory housing practice, so long as shared living spaces are involved. That's a California law. That's the Fair Employment Housing Act of California. You said that you recognize is really what Congress intended in the statute. Well, I cannot say what Congress intended in 1968, but they did explicitly... I suppose we all decide that Congress did not intend to make women live with men, and that it would not be illegal to say, I want to live with a woman. I believe that Congress did think about it, and it was the Mrs. Murphy exception, because Mrs. Murphy wasn't just a boarding house. Mrs. Murphy was a widow with an extra room in her house who needed to rent it out. So now you're saying Congress did intend to make women say that they are willing to live with men and not to say that I want to live with a woman. Under the Mrs. Murphy exception? Well, forget Mrs. Murphy. I just want to know your answer to the question here. In this statute, in A, do you think Congress intended to say that it's illegal for a woman, when looking for a roommate, to say, I want a female roommate? And I think the last time you said no, they didn't intend that. But let's try it again. Well, my answer is that the only thing that we have of Congress's intent is the Mrs. Murphy exception. Well, you can answer just no, yes, whichever you prefer. The answer is I don't know, because there's nothing – Okay, well, then we have to decide that without the benefit of your assistance. And we will. The fact is that those laws are not enforced, and whether by HUD or by California or any other state to prosecute people who say they want to live with another woman in their house. So I think you need to look at the issue of sexual orientation and the issue of – which is illegal no matter what the Fair Housing Act says. In California, and – I suspect in 1968 they wouldn't have intended to say that you have to live with someone with a different sexual orientation either. And the United States Fair Housing Act does not include sexual orientation. But California does, as well as about 15 states and pretty much every city, major city in the country, prohibits discrimination on the basis of sexual orientation in housing. But there is – As far as roommates are concerned? There are exclusions. For example, in the Oregon statute, Fair Housing statute, it says that if there is shared living involved and it's an owner-occupied house or residence, that that's okay to discriminate. California, you have to have an owner-occupied residence and you have shared living and you can only have one other hoarder with you or roommate with you. Then you may discriminate. Can I get you back to where we started because we sort of slid off it? You were explaining what a dwelling is, and I don't think we ever quite got that sorted out. I understand your argument that an apartment, a living unit, no matter how small, is a dwelling. But I have more difficulty with the argument that sharing a room or sharing an apartment, that that is a dwelling. For example, there are many roommate type of arrangements. Let me just offer a couple of them. One of them is you have a two-bedroom house, I'm sorry, apartment, two-bedroom apartment, and you, for some reason, the one bedroom is available, you need the money, you advertise a roommate and find a roommate. The roommate rents the bedroom, which is more or less exclusively used by the roommate, although I guess, I don't know whether people lock doors in situations like that. And then you might share a bathroom, might not share a bathroom, but often you do share a bathroom, you share a kitchen, you share a living space. What is the dwelling there, as far as you understand? Well, the dwelling would be the room and probably the right to use other parts of the house. Well, see, when you say the room, that I understand. That's a physical division. It has walls just like the two halves of a duplex have walls. But saying it is the room plus these rights to use, that becomes much more difficult to accept as a dwelling. To me, it looks to me like the dwelling is the apartment itself. And so long as you've got shared areas, you can't subdivide them into further dwellings. You can subdivide them some other way, but the subdivision is not a dwelling. Let me give you another example. This is from my own experience. Believe it or not, in college, I actually had roommates that we shared a bedroom. There were three bedrooms, well, maybe I was there too. Rent was expensive in Westwood, and so we crammed three beds in. And so we didn't even have the exclusive use of a single room. And if truth be told, sometimes we throw our clothes on the other guy's bed. You know how it is with roommates. So there was really no exclusive use of any part of the apartment. Not the bathroom, not the bedroom, not the kitchen, not the living space, not the closets, nothing. Not even the piano that I brought, you know, sit down and use my piano. So what is the dwelling unit there? Is there any meaningful way we can say that there was more than one dwelling in that space that I was sharing with my two roommates? I mean, wouldn't any construction of the English language, any reasonable construction of the English language say is there was one dwelling that we were sharing? There were not three separate dwellings. If you're all sharing one bedroom, that would seem like that would be one dwelling. And then what? Then does this apply? Well, many of the things that are advertised on roommates and the exception, the 36043 exception actually is talking about the rental of a room. And the rooms are, whether or not they're shared kitchening facilities or a living room, they were definitely, the Mrs. Murphy exception was definitely meant to exclude people that were renting out rooms in their house. Now, if that was a necessary exclusion, that means that people who are renting out rooms in their house and don't own their house or their apartment or are renting out to more than four or three other people, including themselves, they are not covered by that exemption. So the rental of rooms is covered by the plain language, even if you say a dwelling where three people are sharing one room is actually one dwelling. I mean, you would be... Okay, so what about my case where we all shared one room? Or I'll give you another example. Also from my long ago experience in Westwood, I guess Office of Arrangements, there was an apartment with one bedroom and one living room, and two of us shared the living room basically. We had couches that opened up as beds, and then two other roommates shared the bedroom. And none of us knew each other. The landlady basically moved people in and out of there more or less at her will. Or when people quit, she found another roommate. We didn't have responsibility to pay for the entire apartment. We paid quarter share each. And then if a roommate was missing, it was not our problem. It was her problem to fill the missing bed. Would that be a... I mean, I'm not sure. Would the housing law apply to that? Yes, because that's explicitly what the Mrs. Murphy exemption is about. It's about someone having a property and renting out the right to occupy that property, especially if the landlady didn't live there. Then her renting out the property would be covered under the Fair Housing Act provisions, regardless of roommates. I mean, what you guys were doing in the rooms, living together, didn't matter. The Fair Housing Act applies to her and her rental to you. I'm trying to understand how under the language of the... When she goes and says... When she advertised, I forgot, advertising student, I forgot how she got the... Well, there was a sign outside. What was she renting out? I mean, was it a dwelling? Was it a room? I mean, it wasn't any of those things. It was really a one-quarter share of an apartment with sort of shared use of kitchen and bathroom, and they were allowed to cut through our living room. What was it that's being shared there? Can one say that was a dwelling or even a room? Well, that... Let me just go to the language of the 603B2 exemption. It exempts from... Well, let's not look at the exemption. But the language explains... Let's first of all see whether it's covered by the statute. And, you know, maybe we can start there. How does the statute apply? Then I think it still applies because the dwelling is... which is occupied as a residence by one or more persons, families. I don't see why... Well, getting back to Judge Reinhart's question, do you really think this is what Congress had in mind when it said dwelling, that it really was talking about sort of the undivided right to share a piece of an apartment with sort of exclusive use of a bed and nothing else? Well... I mean, everything else was shared, essentially. No, I understand. But I think that they... As I said, even the bed sometimes wasn't inviolate. Well, you know, if you're through staying, you know how it is with... But if the... So, yes, if that is a portion of a dwelling, that is a portion of a building used as a residence by one or more people. I see. So a portion of a dwelling, it applies to a portion of a dwelling as well? Well, a portion... A dwelling means any portion of a building which is occupied as a residence by one or more persons. Where do you find that? Well, that's 3602B. Dwelling means any building structure or portion thereof which is occupied as or designed or intended for occupancy as a residence by one or more families. And families is defined to be a single person as well as a family. So then if you go to the exemption under 3603B.2, that exempts from the prohibitions of discrimination in the sale or rental of a dwelling, rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence. So it doesn't really... So that was a handout to landowners, right? Because if there wasn't, if you didn't have an ownership interest, then you were entitled to the exemption. Correct. And actually in the legislative history, that is clear. People understand that. It's meant to protect the poor widow who's renting out a room in her home, which they may very well be sharing kitchen space, bathroom. There's no requirement that there is a separate bathroom for the exemption or for the Mrs. Murphy. She may have a two-bedroom house and one bathroom and one kitchen and renting out a room. What about the claim that there's constitutional rights to intimate association, which includes the selection of the people you share bathrooms with and possibly bedrooms and kitchen utensils and in front of whom you parade and your towel and sometimes less than a towel. As you know, sometimes people go from, you know, bathroom to bedroom. I don't think that that's an issue that this case needs to resolve because what... Humor me. Well... Let's say we get to conference and we decide we do have to resolve it. Do you want to tell us your view of it? Well, my view is... Would you rather we decide it without your view? No, no. My view, I have a lot of views that are set forth in the brief, in the red brief. So before you decide anything, do read that. So... Could you tell us again? Yes, I will. That it's a commercial relationship that we're dealing with here. We're not talking about people getting together and deciding to live together. We're talking about someone who has a tenancy interest that they are selling to someone, and as soon as they stop paying, they're either going to be kicked out of the house or... So would you agree that, say, if there's an Orthodox Jewish person who has an apartment and has the specific requirements for the kitchen and dietary restrictions and the like, that it would violate the language of 3604 if they were to advertise and rant and pick their roommate based on religion and adherence to Orthodox Judaism? That would violate 3604, wouldn't it? If they claim within the Mrs. Murphy exemption... No, it's just an individual in a two-bedroom apartment, and one of them is strict Orthodox Jewish with various dietary kitchen restrictions. Four sets of plates. But that would violate 3604, right, for that person... You don't want somebody pulling out the passable plates and putting bread on them, right? Or putting a ham in the refrigerator or whatever. So wouldn't that selection based on religion be a violation of 3604? It could be. It would also probably violate the Civil Rights Act of 1866, which prohibits discrimination on the basis of religion. So... We'd have to strike down more than one thing. Go for them all. But, you know, once you start mulling, once you get that lawnmower moving... But just with respect to 3604, you agree that that would be a violation? It could be, but that's not presented in this case. So what we're asking the court to look at is roommate's conduct. It may or may not be presented. But if we decide it is presented, you agree that this would be a violation? Under the plain language of the Act, yes. Thank you. And you don't think that there is a constitutional right to make decisions about who you share that kind of, you know, cooking intents or something like, you know, for some of the reasons suggested by Judge Iguoda's question? Because you don't want people to put ham on your kosher plates or to mix the milky with the meaty or anything like that. But whether or not roommate's users have constitutional rights, what roommate is doing is discriminating against them and limiting their housing opportunities based on other... I understand that there's a further question, and I understand you would like us to focus on that further question. If you want to say, yes, this is a violation, yes, there is a right individually to you as a renter have a constitutional right of intimate association to pick somebody of the same religion as you to preserve the kosher plates, but that right doesn't adhere to roommates, we can talk about that question. That's a different question. We can talk about it. But right now we're just talking about the individual user because as we discussed earlier, ultimately it gets down to the question of whether or not the conduct is illegal by the individual. If it turns out the individual has a protected right to do this, either under the statute or as a constitutional matter, then we have to explore the next question, and that is how does this adhere to roommates. It may not. You may be right. So let's stay focused on the question of the individual user. If you're ready to concede that, yes, the individual user has an individual right in some circumstances, constitutional right or statutory right to select somebody based on religion, then we move on to the next question. If not, I'd like to understand why you think it's never the case. Well, I think when you're in a commercial relationship, which is what we're talking about here, then you perhaps have less of an intimate association right than you do by just choosing who you're going to live with, which obviously is something that would be much closer to being protected. But commercial, saying it's commercial is not talisman. It doesn't sort of change everything. We could have posited that a fact situation, which in a real world situation, somebody who's orthodox, and we happen to pick, I mean she happened to pick Jewish, but you could pick a lot of other religions and have dietary requirements. I think there are Hindus who don't eat meat as a religious matter, for example. I'm just giving other examples. But we picked the orthodox Jews because it's a very clear-cut and well-known example. So what you're saying is it is a violation of the law for somebody who's an orthodox Jew who has an apartment, wants to rent out a room or a portion of an apartment to somebody else to share expenses to say, but I will only pick somebody who will respect the dietary laws. It would be protected from a different part of the Constitution. That would be protected under the First Amendment freedom of association, religious association. The intimate association we're talking about here comes from the Due Process Clause, and that is— I'm not familiar with the right of religious association. Well, for the purposes of religion, yes. You don't know that one? I don't. I'm sorry. Give me a case. Which one is that? I know about religious speech and religious worship. I didn't know there was a— I thought there was, under freedom of association, that there was a right to come together for religious purposes. Well, I'm sorry. Oh, I see the right to worship. But this is not for worship. You're not getting a roommate to worship together. You are getting a roommate to share expenses and share a living space, but you want that roommate to be somebody who will adhere to the same requirements of how you deal with eating, how you deal with cleanliness, and so on, that conform with your religious views. This is not worship. This is living of daily life. But sharing religious views. I may want you to bow down to Mecca together six times a day. Fine. It may not be to worship, but it's to share. It's like freedom of expressive association to share religious views with people. That's different than the right of intimate association to— No, we never want to talk. I just want to make sure when I'm not there, he doesn't bring home the, you know, honey bacon, the bacon, and put it in the refrigerator, because that would be a disaster. It would make the entire refrigerator and everything it touches non-ritually clean, and you'd have to throw all that stuff out and buy a whole new set of— you know, it's a disaster, really, for somebody who's religious. So it's not for worship. I don't really care. I don't want to talk to him about, you know, I'm Mushkinazi, he's Sephardic. I don't care. We don't talk about these things. But I want him to adhere to my religious, you know, to the same rules, so that I don't have to buy a new refrigerator every time I have a roommate. I mean, that's—is there a right like that? But you're changing it, because now you're focusing more on the commercial aspect of it, that—and the non—the secular part of it. I think I've always have. You want to push it in the other direction. But I think that Dakota's question was that, and I think my question continues. We're talking about sort of the mechanical act of eating and buying food and buying utensils, and the fact that if you buy the wrong kind of food and put it on the wrong kind of plate, you will then cause serious economic harm. Or if it's unbeknown to the person that this is done, you know, and cause them, you know, psychic harm by having eaten off a plate that's not virtually pure. I'm not going to concede that in that situation the person has a constitutional right to discriminate. Okay. You think that they don't. Well, I think we finally got an answer to that question. Maybe we can find another question. Assuming we disagree with you on that point, let's say we decide, you know, on the statute of the Constitution, can you now talk a little bit about how this would apply to roommates? Let's say there is such a right. This is the question you wanted to talk about. Okay. So why don't you explain to me if, in fact, the individual, would you call them users, users have a right to discriminate on this basis, why roommates can't help them actuate those rights by making that a meaningful choice in selecting a roommate? Well, one reason is because it's not just people living in the houses or in the apartments that are choosing the roommates. There's no requirement on the website that you be an occupant of the house. And, in fact, there are people who have posted testimonials saying how great it is that they can find roommates for their houses or their friends' houses by going on the site. If some substantial percentage, let's just say hypothetically, of the users are people with legitimate shared living arrangements, and so roommates publishing and other activities to make these discriminatory preferences known to assist in these preferences, so some substantial percentage relates to this protected, hypothetically, activity, then why wouldn't roommates publishing and printing, at least, be protected by the First Amendment? It's a sort of speech, and let's put the steering aside for a moment. It's a form of speech which relates, at least in substantial part, to activities which are not unlawful, per hypothesis. So doesn't the First Amendment protect that speech element at that point? Well, I would say at that point that we'd be dealing with commercial speech. So you're saying the drop-down menus and responses, which is what's before us as roommate speech, is proposing doing nothing more, I think is the formulation, than proposing a commercial transaction. Is that correct? Roommates, part of it, yes. Okay. And so if we agreed with that, that it was commercial speech and Central Hudson was the appropriate test, then we'd have to say that, among other things, there was a high social interest in preventing the orthodox Jew or the woman or whatever it is from selecting their roommate. Isn't that what we would have to say in order to say that roommate speech could be precluded? No. What you would say is that Congress, in enacting the Fair Housing Act, intended to stop all forms of discrimination. But now we're talking about an as-applied. We're applying 3604 to roommate speech. And so we would have to say that can constitutionally be applied to roommate speech because, assuming we agree it's only proposing a commercial transaction because it fails the Central Hudson test, which includes the societal interest in stopping that sort of speech. But the interest is Congress's interest in stopping discriminatory speech related to the rental or sale of dwellings. Even when it's individuals. Right. But the reason that it's a substantial interest and the reason is that it passes the Central Hudson test is because there are the secondary effects of discriminatory speech that are part of what Congress was trying to stop. That is giving the impression that discrimination is legal, stopping people from looking at particular housing opportunities because they see. But if we got to the first step, which you don't agree with, as Ted Kaczynski said, it was not illegal. It would not be illegal because Congress didn't intend this to apply to roommates, which then brings you to the fact that what do we find in the statute that says that? They didn't intend dwelling to be what Ted Kaczynski explained about all his college experiences and all the times he's had roommates. I didn't tell you about all of them. How he chairs beds or any of that. They were all guys. All for the purposes of leading us to the conclusion that when Congress talked about dwellings, they were not talking about roommates. And if that's true, then we don't need to go through all this high-flown stuff about Central Hudson because Section C doesn't apply at all because that also is dwellings. So we've answered it all with the first question. Okay, good. I'm glad. Thank you. Thank you. Thank you. You had a little time for a bottle. Mr. Alger. Thank you, Your Honor. Just a couple of points, and that is that the site is set up for sharing of places. It doesn't talk in terms of rooms for roommates. Let me just make sure I understand. Roommates does not have a drop-down menu or a choice for race. No, it does not. Okay. But whatever answer we give to the question you pose would apply to race as well. So let's say, of course, if we say it's not okay, then it's over. But let's say we say it's okay, either because we go through the statute that way or because we have determined that there is some constitutional right lurking there. It would enable you to then, let's say it is okay, to create a drop-down menu that specified race, both required disclosure of race and allowed you to specify whom the roommate you're looking for would be of a particular race. Isn't that right? I think under pure reading of the law, depending on how the court writes its opinion, that's correct. However, in this situation, those are not factors that are relevant to the choice of roommate, and it's very unlikely that a site such as my clients would do that. Whatever we write will apply to more than just you. It will apply to everybody. And along comes a competitor who decides to be faster and cheaper, whatever. And one way they decide to undercut you is by saying no Jews. You can pick no Jews. You can pick no Asians. We can pick no blacks. So is there some way in which we can solve your problem that wouldn't immediately enable that kind of conduct? Or is that simply the way it is? I think it's been made clear by the Supreme Court that in our society we have to put up with some speech that's offensive, and there's a greater good of having a great deal of speech. We're not talking about speech here. We're not talking about people selecting roommates and saying I prefer to have a white roommate. If I'm white, I prefer to have a white roommate, or I don't like Asians, I don't like Indians. Well, Kurt, that's permissible anyway under our earlier decision where you can say that in the comments. Yes, that's right. You certainly can do that. I'm just saying whatever answer we give as to what's permissible for roommates.com would apply to your next competitor that would then have dropped down menus and requirements and the like that would limit choices based on race, religion, ethnicity, any of those things, right? I suppose, but the marketplace will have to take care of that. The fact of the matter is there are already many sites now. You know, I suppose it's sort of a wishy-washy answer. The answer is yes. The answer is yes. There are already many sites that cater to particular groups. There's a Jewish roommate site. There's a number of gay roommate sites now that just essentially focus on those types of roommates. Our site is a more general site, and the three factors that people have said that they like to know include gender and orientation and children, so that's why they're in the drop-downs. But when a Fair Housing Council goes to choose the Jewish website or the gay website or anything like that, what we write in this case will control that case as well. Yes. There's no way in which you can think of that we could come up with a right of association or consider a statute that would slice it where you slice it but not also include those other possibilities. A judicially created BFLQ would do it because in that situation the court could say there are certain things that are relevant to the choices in a shared housing circumstance, and they involve privacy and security. And under those circumstances, choice of gender issues, orientation issues, presence of children, that those are relevant, those are legitimately relevant to the choice of roommate, and therefore those types of- You mean children are dangerous? No. I have the same way. Sometimes my children are dangerous. If you have glassware or Kislow or stuff like that. I certainly think that people have a right to have a home environment where they're free of distraction. Perhaps they might be law students or medical students and they don't want kids running around. There might be situations where a single mother has children and she doesn't want to have men. She wants to have- It's a slippery rationale because if you are a Nazi, if that's your belief, you would probably not rest easy in your home if you had a roommate who was an Orthodox Jew. Although I think it would be the other way around. Well, it might be mutual. The fact of the matter is- So here you are, Moshe, you have a tie, and in comes Heinz with a swastika tattooed on his cheek. And you want to say, no, thank you. I prefer not to have you as a roommate because I like to sleep easy at night. And that gets to the whole point. Is this speech restriction appropriate under whether it's intermediate scrutiny or strict scrutiny? It isn't appropriate because it's not going to change the underlying behavior. People are going to continue to choose roommates based on safety considerations and comfort considerations and privacy considerations. They will continue to act that way. And so you don't have a substantial governmental interest, you don't have a compelling governmental interest, and you don't have a fit that's going to materially advance the government's- whatever interest the government has, whether it be psychic harm or integration within houses, which Congress never addressed integration within houses. They were trying to integrate neighborhoods and get people out of the ghetto. And that's what's expressed in- Well, but the Civil Rights Act shows that that's wrong. I mean, people could continue to discriminate when renting out apartments, and people said, well, you can have all these requirements, and then when it comes down to it, the landlords will decide not to rent to blacks or whatever. And as a matter of fact, we've changed the society. People make employment decisions now. We used to make them based on race. You know, they used to have Irish not- need not apply signs. I don't think people think that way anymore. To some extent, when you change the channeling, you actually do change behavior. You change attitudes. Isn't that the history of the last 40 years? I think that's true, and people should be enlightened about who they share homes with. And I would hope that people do- are open-minded in who they share homes with. But that doesn't mean that we're in a position where we're supposed to be telling people they can't choose to live with a woman if they're a woman, or they decide that they don't want to live with kids if they're studying for the bar exam. That's not for us to decide. That's why we have a right of intimate association. And the Supreme Court has laid out what the parameters are, the size, the selectivity, and so forth. Those are- this meets all those criteria in Roberts and in Rotary Club. Okay. Thank you, Your Honor. Any further questions? Okay. Thank you, counsel. The case file will stand submitted. We are adjourned.
judges: Kozinski, Reinhardt, Ikuta, Cjj